**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| **CURTIS M. LEWIS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **Case No. 2:15CV63 PLC** |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

Curtis Lewis ("Plaintiff") seeks review of the decision of the Social Security Commissioner, Carolyn Colvin, denying his application for Disability Insurance Benefits under the Social Security Act. The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 9). Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's application.

## I.    *Background and Procedural History*

In May 2012, Plaintiff filed an application for Disability Insurance Benefits alleging he was disabled as of July 1, 2007.[1] (Tr. 230-41). The Social Security Administration (SSA) denied Plaintiff's claims, and he filed a timely request for a hearing before an administrative law judge. (Tr. 168-72, 175-76). The SSA granted Plaintiff's request for review and conducted a hearing on November 13, 2013. (Tr.132-53). In a decision dated February 12, 2014, the ALJ found that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time

---

[1] Plaintiff previously applied for Disability Insurance Benefits in March 2008. (Tr. 160). The SSA dismissed Plaintiff's case after he failed to appear at the administrative hearing. (Tr. 157-58).

through June 30, 2011, the date last insured." (Tr. 28). Plaintiff requested review of the ALJ's decision and submitted additional evidence to the SSA Appeals Council, which denied Plaintiff's request for review. (Tr. 307-10, 1-3). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.     *Evidence Before the ALJ*

### A. ALJ Hearing

Plaintiff appeared with counsel at the administrative hearing on November 13, 2013. (Tr. 132). Plaintiff stated that he was born in 1982, had a GED, and lived with his wife and two children. (Tr. 134). Plaintiff testified that he suffered the following impairments: back, neck, and shoulder problems; wrist issues; depression and anxiety; high blood pressure; and fibromyalgia. (Tr. 135). He was currently taking cyclobenzaprine, Xanax, hydrocodone, Fentanyl, citalopram, Adderall, and gabapentin. (Tr. 135-36). Plaintiff stated that he saw Dr. Goldman once a month for depression. (Tr. 136).

In regard to his back pain, Plaintiff testified that his pain level was a nine on a ten-point scale, and it radiated into his legs, causing them to "go numb." (Tr. 137, 144). The radiating pain occurred "[o]ff and on all day." (Tr. 144). His most recent visit to the emergency room for back pain was "[a]bout a month ago." (Tr. 137). Plaintiff rated his neck pain at an eight, and stated that it radiated to the top of his head. (Tr. 138, 145). Plaintiff's neck pain was also "pretty consistent off and on all day." (Tr.145).

Plaintiff testified that he could: walk approximately one and a half blocks before needing to sit and rest; stand in place for five to ten minutes; and lift five to ten pounds. (Tr. 138-39). Due to problems with his wrists, Plaintiff tended to drop things, such as his coffee mug and

cigarettes.[2]  (Tr. 139).  Additionally, "if I'm talking on the phone it – within five minutes my arm will go numb."

Plaintiff explained that, on a typical day, he would "just stay around the house and try to nap and relax and keep my muscles from tensing up.  Seems like if I try to do a lot, then it really puts me down and [sic] where I'm bedridden."  (Tr. 140).  He napped one to three times per day for approximately thirty minutes.  (Id.).  Plaintiff took medication to help him sleep at night.  (Tr. 141).  To control his pain, he used a heating pad two times per day for thirty to forty-five minutes.  (Tr. 142).  Plaintiff stated that his wife helped him dress and get in and out of the shower.  (Tr. 139).  Plaintiff had a driver's license and was able to drive.  (Id.).

In regard to his mental impairments, Plaintiff stated that he was diagnosed with bipolar disorder and ADHD.  (Tr. 142, 144).  Plaintiff experienced "manic" episodes, which lasted one to three days, about four times per month.  (Tr. 142-43).  During these times, Plaintiff was "[v]ery hateful and saying things I probably shouldn't."  (Tr. 143).  Plaintiff also suffered panic attacks "at least probably six times a month," but, when he took his medicine, "[i]t'll smooth me out enough that I'm not freaking out."  (Id.).  As a result of his ADHD, Plaintiff had "trouble focusing and staying on task."  (Tr. 144).  For example, when helping his third-grade daughter with her homework, "I'll get frustrated" and "even if I read the instructions, I can't comprehend it."  (Id.).

Vocational expert James Lanier also testified at the hearing.  (Tr. 146).  Mr. Lanier testified that Plaintiff previously worked as a cook, order filler, and roofer.  (Tr. 148).  The ALJ asked Mr. Lanier to consider a hypothetical individual with:  Plaintiff's age, education, and work experience; ability to perform sedentary work with a sit/stand option; limitations to occasional

---

[2]  Plaintiff later testified that he had switched from cigarettes to an electronic cigarette approximately thirteen months ago.  (Tr. 144).

overhead reaching with the left extremity and occasional handling and fingering; ability to perform "simple" work defined as "routine, and repetitive tasks with no strict production quota, with the emphasis being on a per-shift rather than a per-hour basis"; and limitations to occasional interaction with the public and coworkers. (Tr. 148-49). Mr. Lanier testified that such individual could not perform Plaintiff's past work, but could work as a document preparer, call-out operator, or circuit board touchup screen assembler. (Tr. 149). The following additional limitations on the hypothetical individual would preclude work at all exertional levels: being off task fifteen percent of the day or greater in addition to regularly scheduled breaks; two or more unexcused or unscheduled absences per month on a continuing basis; or two or more unexcused or unscheduled breaks per workday. (Tr. 150-51). Likewise, if such individual "is not able to carry on in a normal [or appropriate] fashion," then he would "eventually be terminated." (Tr. 152).

    *B. Relevant medical records*

        *1. Prior to June 30, 2011, the date last insured.*

On September 28, 2008 Plaintiff saw his primary care physician, Dr. John Memken for medication management. (Tr. 382). Plaintiff reported that "everything is just pretty much about the same," and Dr. Memken continued Plaintiff on Cymbalta. (Tr. 382). Plaintiff saw his rheumatologist, Dr. Imeda Cabalar the same day. (Tr. 383). Plaintiff was taking Vicodin and Flexeril for his degenerative disc disease, and he informed Dr. Cabalar that "he still has diffuse muscle pain but better compared to before." (Id.).

Plaintiff returned to Dr. Memken's office on October 27, 2009, after "an extremely long hiatus." (Tr. 385). Plaintiff informed Dr. Memken that he had been seeing Dr. Lieb for pain

medicine.[3]  (Id.).  Plaintiff reported that, about one week prior, he was standing up and riding on the back of a four-wheeler when it was intentionally struck by a pick-up truck, causing Plaintiff to sustain an acute injury to his back.  (Id.).  Dr. Memken "admonished the patient" and agreed to prescribe a limited supply of hydrocodone, but warned that "I am not going to give him any more pain medicine, and I am going to communicate with Dr. Lieb about this."  (Id.).

On January 25, 2010, Plaintiff went to the emergency room for vomiting caused by pain in his head.  (Tr. 355).  Plaintiff also stated that his neck and back had been hurting since the four-wheeler accident about two months prior.  (Id.).  Doctors administered intravenous medications, ordered a CT scan and x-rays, and prescribed Ultram.  (Id.).  Plaintiff's head CT and chest x-ray were normal, while the x-rays of his thoracic spine revealed "slight loss of vertebral body heights in the mid thoracic region."  (Tr. 364-65).  Plaintiff followed up with Dr. Memken on January 29, 2010, and reported "exacerbation of all of his symptoms."  (Tr. 387). Plaintiff stated that he was "smoking cigarettes like crazy" and "even…used a little controlled substance because he was so tensed up."  (Id.).  Dr. Memken offered to refer Plaintiff to Dr. Luvell Glanton for pain management.  (Id.).

On March 10, 2010, Plaintiff called Dr. Memken requesting a refill on his hydrocodone because "Dr. Glanton would not fill this for him, and he does not want to go back down to Dr. Lieb." (Tr. 388).  Dr. Memken prescribed 100 hydrocodone.  (Tr. 388).

Plaintiff returned to Dr. Memken's office on November 3, 2010 "with a derangement to his left shoulder which occurred about 3 months ago" when he "tripped getting out of the truck[.]" (Tr. 389).  Plaintiff was experiencing "numbness and tingling in both of his arms and he is having a big popping sensation and pain in his left shoulder."  (Tr. 389).  Dr. Memken

_____

[3] Despite numerous references to Dr. Lieb, the record contains no documentation evidencing Dr. Lieb's treatment of Plaintiff.

observed "what appears to be almost complete dislocation of his scapula with a huge step off, dramatic winging in the back," and ordered an MRI scan. (Id.). The MRI revealed "[p]artial tears of the supra- and infraspinatus tendons" and "[m]ild acromioclavicular joint osteoarthritis." (Tr. 379). An MRI of Plaintiff's cervical spine, taken on February 25, 2011, revealed "small disc bulge at C6-C7 without significant canal or foraminal narrowing." (Tr. 347).

> 2. *After the June 30, 2011 date last insured*.

Plaintiff visited Dr. Memken on July 1, 2011 after "an episode yesterday of some vomiting of blood." (Tr. 391). Plaintiff explained that "he was working out in the heat" and became overheated. (Id.). Dr. Memken noted: "[Plaintiff] said that he is extremely nervous. He has been working for Kevin Lionberger. He says that Kevin just has him doing all kinds of things and is keeping him on edge all the time." (Id.). Dr. Memken prescribed lorazepam and ordered CT scans of his abdomen and pelvis, which were unremarkable. (Tr. 391, 378).

When Plaintiff followed up with Dr. Memken on July 13, 2011, he was "doing fine" but continued "to have his low down abdominal pain." (Tr. 392). Plaintiff informed Dr. Memken that "[h]e is not working much at all, because he feels that this is just stressing him out too much." (Id.). Dr. Memken reviewed Plaintiff's CT scan, which showed Plaintiff was missing his right kidney but revealed no other abnormalities. (Id.). Dr. Memken referred Plaintiff to Dr. Katbamna for a colonoscopy, but Plaintiff did not present for that appointment. (Tr. 392).

On September 9, 2011, Plaintiff visited Dr. Memken due to "gravel in his eye." (Tr. 393). Plaintiff "was working on remodeling a house and evidently was doing some chipping on a floor and some debris flew up striking him in his right eye." (Id.). On September 21, 2011, Plaintiff saw Dr. Memken for shoulder pain. (Tr. 394). Dr. Memken diagnosed rotator cuff syndrome and administered injections of lidocaine and Celestone. (Id.).

After a motor vehicle accident on December 29, 2011, Plaintiff arrived at the emergency room by ambulance reporting abdominal and lower back pain. (Tr. 328). CT scans of his head, spine, and chest were normal. (Tr. 334-38).

On May 3, 2012, Dr. Memken refilled Plaintiff's hydrocodone-acetaminophen and lorazepam and prescribed Duragesic patches. (Tr. 396). Dr. Memken noted that Plaintiff was a "[c]urrent everyday smoker." (Tr. 396). Plaintiff informed Dr. Memken that he "made a trip down to St. Louis," and "[t]hey told him that there is nothing they could do for his spine, other than completely fuse it, which would kind of immobilize his spine kind of badly. They have predicted that he will continue to deteriorate and will be completely an invalid and in a wheelchair within five years, which kind of depressed him." (Tr. 397).

Plaintiff returned to Dr. Memken's office on June 4, 2012. (Tr. 398). Plaintiff's wife accompanied him and informed Dr. Memken that Plaintiff was "having trouble accepting his diagnosis, which is terminal back syndrome, and cannot accept the fact that he will never be able to work for the rest of his life." (Id.). Dr. Memken refilled Plaintiff's hydrocodone-acetaminophen, increased his Duragesic patches, and prescribed Citalopram. (Id.).

On June 6, 2012, Plaintiff saw Dr. Theodore Choma in regard to his back condition. (Tr. 441). Dr. Choma noted that he had previously diagnosed Plaintiff with multilevel disc degeneration and had treated him with an epidural steroid injection, "which gave him some relief." (Id.). Plaintiff stated that he had recently undergone shoulder surgery and "was referred back to me for evaluation of his arm numbness." (Tr. 442). Dr. Choma ordered Plaintiff an epidural steroid injection, referred him to a neurologist, and "strongly counseled smoking cessation." (Id.). An x-ray of Plaintiff's cervical spine revealed "no significant disc space narrowing" but "suggest[ed] at least slight prominence of soft tissues [sic] the adenoidal region."

(Tr. 443). Plaintiff "stated that his symptoms were improved immediately post [injection]." (Tr. 447).

Dr. Goldman completed a psychiatric evaluation for Plaintiff on June 12, 2012. (Tr. 409). Dr. Goldman observed that Plaintiff, who presented with his wife, was "adequately groomed," "polite and cooperative," "maintained good eye contact throughout the interview," and was "spontaneously conversant." (Id.). Dr. Goldman also noted that Plaintiff "demonstrated a mild processing delay" and "displayed some body movements that were mildly jerky and almost tic like." (Id.). Plaintiff informed Dr. Goldman that, while he no longer drank, he had a history of alcohol abuse, including two DUIs, and was "currently smoking three packs per day." (Tr. 409, 432). Plaintiff complained of difficulty sleeping, poor memory and concentration, lack of appetite, low energy, and mood swings. (Tr. 410). Dr. Goldman diagnosed Plaintiff with "bipolar disorder type I, most recent episode depressed, moderate" and "anxiety disorder/social phobia," and he prescribed Saphris. (Tr. 410-11).

Plaintiff met with his community support specialist, Josh Smith, for two hours on June 22, 2012, to "assess his mood and situation." (Tr. 430). Plaintiff reported that he was "still somewhat agitated," but "overall he has noticed a significant improvement" and the medication had "helped considerably" in reducing his "anger outbursts." (Id.). Mr. Smith noted that Plaintiff "has to deal with the fact that he is unable to work as much as he once did due to his degenerative back disease . . . ." (Id.).

On June 26, 2012, Plaintiff presented to Dr. Miguel Chuquilin, a neurologist, for treatment of the numbness in his hands. (Tr. 448). Plaintiff stated he quit smoking two weeks ago. (Tr. 450). Dr. Chuquilin ordered an EMG nerve conduction study to determine the cause of

the numbness. (Tr. 451). The EMG study revealed "mild to moderate right median neuropathy at the wrist." (Tr. 452-53).

Plaintiff returned to Dr. Goldman on June 28, 2016 and stated that he was "doing better" with his medications, but felt "hungover when I first get up." (Tr. 408). In a session with the support specialist, Mr. Smith, on July 9, 2012, Plaintiff reported that he was "doing well" overall and "doing better in regards to not blowing up or becoming overly angry." (Tr. 429). Plaintiff informed Mr. Smith that he had "been able to do small jobs and look at expanding some business options [with his brother-in-law] as a way to keep busy and look at generating some degree of income that will assist him." (Id.).

Dr. Barbara Markway, a state agency psychological consultant, completed a psychiatric review technique for Plaintiff on July 6, 2012. (Tr. 161-63). Dr. Markway diagnosed Plaintiff with an affective disorder but, because Plaintiff had failed to complete a function report, she found there was insufficient evidence to evaluate the effect of his impairment on his activities of daily living, social functioning, or concentration, persistence or pace. (Tr. 162).

In a visit with Dr. Goldman on July 25, 2012, Plaintiff's wife stated that he was "severely, severely, severely depressed," and Dr. Goldman adjusted Plaintiff's dosage of Saphris. (Tr. 407). Plaintiff spoke to Mr. Smith by telephone on August 1, 2012 and reported that "his medications are effective for him at this time….he has been exploding less and feels the medication is effective with fewer side effects at this time." (Tr. 427). Plaintiff also informed Mr. Smith that he "continues to experience a great deal of back pain but has been able to keep busy with his brother-in-law in various activities." (Id.).

Plaintiff saw Dr. Memken for back pain on August 7, 2012. (Tr. 572). Plaintiff informed Dr. Memken that "the Duragesic is working good, but it made him way too moody…and he just

felt like he needed to get off of it." (Id.). Dr. Memken switched Plaintiff to a Lidoderm patch. (Id.).

On August 9, 2012, Plaintiff visited Dr. David Volgas for treatment of his bilateral hand numbness. (Tr. 457). Dr. Volgas diagnosed Plaintiff with mild to moderate carpal tunnel syndrome and prescribed night splints and gabapentin. (Tr. 458-59).

In a meeting with Mr. Smith on August 10, 2012, Plaintiff informed him that his "mood was mostly stable, but that his pain in his back has increased and this has in turn increased his irritability[.]" (Tr. 425). On August 24, 2012, Mr. Smith noted that Plaintiff continued to experience depression and chronic back pain. (Tr. 423). The same day, Plaintiff presented to Dr. Memken with a sore throat and lower back pain. (Tr. 574). Dr. Memken observed that Plaintiff had resumed smoking and had not filled Dr. Volgas's gabapentin prescription. (Tr. 575). Although Dr. Memken agreed to prescribe Vicodin, Plaintiff "was kind of insinuating that he absolutely needed something stronger to just take the edge off the pain a little bit because he was really suffering." (Id.). Dr. Memken refused to prescribe anything stronger and urged Plaintiff to start the gabapentin. (Id.).

On September 5, 2012, Plaintiff and his wife saw Dr. Goldman, and Plaintiff's wife informed Dr. Goldman that she "tapered him off the meds [because] they weren't helping at all." (Tr. 406). Plaintiff complained of racing thoughts and low energy. (Id.). Dr. Goldman prescribed cyclobenzaprine. (Id.). At an appointment with Dr. Memken the following day, Plaintiff complained that he was "at his wits ends" because his "back is killing him." (Tr. 576). Plaintiff believed the gabapentin had helped him, but he stopped taking it due to an allergic reaction. (Id.). Dr. Memken referred Plaintiff to Dr. Glanton for pain management and Dr.

Ronholm for a rheumatology evaluation. (Tr. 577). Plaintiff did not keep his appointment with Dr. Ronholm on December 10, 2012. (Id.).

Also on September 6, 2012, Plaintiff presented to the emergency room with a broken tooth and vomiting. (Tr. 487-98). Doctors administered a morphine IV and, upon discharge, prescribed Percocet, clindamycin, and Zofran. (Tr. 491). On September 7, 2012, Plaintiff told Mr. Smith that "his medications continue to fluctuate with their effectiveness" and he "seems to suffer from a lot of side effects." (Tr. 421).

Plaintiff returned to the emergency room for dental pain on September 14, 2012. (Tr. 475-86). Plaintiff stated that he had two teeth pulled earlier in the week and "started having worse pain today, headache throbbing, rating 8/10." (Tr. 475). The hospital physician found no sign of infection or dry socket, and he prescribed Percocet. (Tr. 478). The doctor noted: "Pt was upset we are offering him PO meds only. As he has normal vitals and was in no distress until he was told he wouldn't be getting morphine, I am concerned for drug seeking behavior." (Tr. 479). The same day, Plaintiff met with Mr. Smith and informed him that "he has had some luck with his current medication and recently had a tooth pulled which has helped with pain." (Tr. 419).

Plaintiff saw Dr. Glanton for pain management on September 24, 2012. (Tr. 599-602). Dr. Glanton diagnosed Plaintiff with degenerative disc disease, lumbosacral; thoracic disc disease; and myalgia and myositis. (Tr. 602). Dr. Glanton noted that Plaintiff smoked one pack of cigarettes per day. (Tr. 601). He ordered x-rays of Plaintiff's spine and a TENS trial, and he scheduled a follow-up appointment in two weeks. (Tr. 602).

In appointments with Mr. Smith on October 5 and 19, 2012, Plaintiff complained of continued back pain and depression. (Tr. 526, 524). At an appointment with Dr. Goldman on

October 29, 2012, Plaintiff's wife complained that Plaintiff "can't focus on anything long enough to do anything." (Tr. 505). Plaintiff reported that the Saphris "helps him control his mood. He's not so snappy." (Id.). Dr. Goldman prescribed Adderall for Plaintiff's memory and concentration. (Id.). The same day, Plaintiff informed Mr. Smith that he "is doing fair at this time," "continues to have little success with medication," and is "frustrated with the lack of relief from the back pain." (Tr. 522).

On November 1, 2012, Plaintiff told Mr. Smith he was "doing a little better." (Tr. 520). Plaintiff reported that the Adderall "is working okay," "his anger has been relatively stable," he "has less back pain at this time and that has help[ed] him remain calm," and "his depression is present but has improved slightly." (Id.). On November 14, 2012, Plaintiff informed Mr. Smith he was "doing fair," but was experiencing "some mild side effects[,] such as fatigue," from his medications. (Tr. 518).

In a medical source statement (MSS) dated November 30, 2012, Dr. Goldman noted that Plaintiff had ADHD and "marked impairment in focus, concentration, and memory." (Tr. 53). In addition, he wrote that Plaintiff's "[a]bility to focus, concentrate, remember and carry out instructions are dramatically impaired by his social phobia/anxiety [illegible word] mood instability" and that Plaintiff suffered "severe chronic physical pain that exacerbates his underlying psychiatric issues." (Tr. 53-54). Dr. Goldman found that Plaintiff was: moderately impaired in his ability to understand and remember simple instructions; markedly impaired in his abilities to make simple work-related decisions and understand and remember complex instructions; and extremely impaired in his abilities to carry out simple and complex instructions and make complex, work-related decisions. (Tr. 53). In regard to Plaintiff's ability to interact with others, Dr. Goldman found that Plaintiff was: markedly impaired in his ability to interact

appropriately with the pubic and co-workers; and extremely impaired in his ability to interact appropriately with supervisors and respond appropriately to usual work situations and changes in routine.  (Tr. 54).

On December 19, 2012, Plaintiff sought treatment from Dr. Choma for his "intermittent chronic low back pain."  (Tr. 460-61).  Plaintiff informed Dr. Choma that, over the last few months, he had been experiencing "episodic low back pain and spasm, not simply confined to the lumbosacral region, but throughout the lumbar region."  (Tr. 460).  Plaintiff reported that he had stopped smoking.  (Id.).  Dr. Choma counseled Plaintiff as follows:  "I have explained to him that he is experiencing the known natural history of this [degenerative] process.  I have assured him that this is not dangerous, although it can be intermittently quite painful. . . . Given its diffuse nature, this is not likely amenable to surgical intervention."  (Tr. 461).  Dr. Choma ordered x-rays and an interlaminal epidural steroid injection.  (Tr. 461-68).

During an appointment with Dr. Goldman on December 27, 2012, Plaintiff reported that he "was doing real good then yesterday I fell on the ice and set off my shoulder."  (Tr. 503). Plaintiff also stated the Adderall was "helping a lot," and Dr. Goldman increased the dosage. (Id.).

Dr. Choma completed a MSS for Plaintiff on January 14, 2013 (Tr. 470-72).  Dr. Choma noted the following limitations:  lifting/carrying 20 pounds, standing/walking six hours per eight-hour workday, and sitting less than six hours per eight-hour day.  (Tr. 470-71).  Dr. Choma also stated that Plaintiff's ability to push/pull was limited in his lower extremities.  (Tr. 471).  In regard to postural limitations, Dr. Choma found that Plaintiff could occasionally climb, balance, kneel, crouch, crawl, and stoop.  (Id.).  Dr. Choma recorded no manipulative, visual/communicative, or environmental limitations.  (Tr. 472).

In meetings with Mr. Smith on January 22, 2013 and February 5, 2013, Plaintiff stated that he was doing "fairly well." (Tr. 514-15, 512-13). On February 13, 2013, Plaintiff informed Dr. Goldman that he was depressed after his mother's boyfriend died, but "I think I'm doing fine now." (Tr. 502). Plaintiff also stated that, the previous day, he "stepped into a hole in the ground, twisted my ankle and fell," but otherwise, "I think everything's been going very well." (Id.). Plaintiff again informed Mr. Smith that he was "doing fairly well" on March 7, 2013. (Tr. 510). Plaintiff stated that his anger was improved, but not resolved, and he continued to suffer pain in his shoulders and lower back. (Id.).

On April 2, 2013, Dr. Matthew Smith at the UMC Orthopaedic Clinic examined Plaintiff's left shoulder. (Tr. 581-82). Dr. Smith noted that Plaintiff underwent arthroscopy about one year earlier but was now experiencing "pain around his left side of his neck, some headaches, burning pain into his left scapula." (Tr. 581). Dr. Smith ordered x-rays and an MRI. (Tr. 582). The x-ray of Plaintiff's shoulder revealed "[s]light further decrease in the glenohumeral joint space without other new findings." (Tr. 583). The MRI showed the following: C6-7 mild to moderate central canal and mild bilateral foraminal stenosis secondary to a disc herniation and degenerative disease; C3-4, C4-5, C5-6 mild central canal stenosis secondary to degenerative disease and a congenitally small central canal; and sphenoid sinus disease. (Tr. 584-85).

Plaintiff met with Mr. Smith on April 5, 2013 and April 19, 2013. (Tr. 508-09, 506-07). At the latter appointment, Plaintiff reported "he had been feeling well until yesterday" and his "depression had increased." (Tr. 506). Plaintiff acknowledged that he "needs to stop pushing himself with physical activities at this time." (Id.).

In a progress note dated May 3, 2013, Mr. Smith stated that Plaintiff was "feeling fair" but "admit[ted] that his depression has been increasing since he had his last MRI results" and "he has a short fuse due to the chronic pain and numbness he feels." (Tr. 121-24). Mr. Smith wrote: "[Plaintiff] has improved greatly with remaining medication compliant and states [his] current medications from Dr. Goldman are doing well for him at this time." (Tr. 123). Plaintiff also reported that, despite his back pain, "he has taken on a small job to assist with money that will not hurt his back to a large degree." (Id.).

Plaintiff returned to Dr. Choma on May 15, 2013. (Tr. 586-87). Dr. Choma "explained [to] him that in the absence of any neurological compression, there really is no surgical option for him." (Tr. 587).

On May 17, 2013, Plaintiff informed Mr. Smith that he was "very disappointed" because Dr. Choma could not help him at this time. (Tr. 119). On May 24, 2013, Plaintiff reported to Mr. Smith that he was "feeling some improvement at this time with his mood." (Tr. 113-16). On June 14, 2013, Plaintiff informed Mr. Smith that he was "doing fair" and "his back is feeling a little bit better." (Tr. 109-11).

On July 9, 2013, Plaintiff presented to the emergency room with abdominal pain. (Tr. 530-62). The hospital staff ordered a CT of his abdomen and pelvis, which revealed "no acute CT findings of the abdomen/pelvis. Nonobstructing left nephrolithiasis." (Tr. 555). Plaintiff returned to the emergency room on October 8, 2013, for treatment of neck and back pain after falling down two flights of stairs. (Tr. 591-98). The emergency room doctor diagnosed Plaintiff with a contusion and cervical strain, but did not prescribe medication because Plaintiff was already taking hydrocodone four times per day. (Tr. 596).

When Plaintiff saw Mr. Smith on October 4, 2013, he reported "he had been doing well with his mood and his back pain until he had a motorcycle accident. Client states he wrecked his bike and hurt his back at that time. . . .[T]his had increased his pain and his irritability." (Tr. 107).

Plaintiff and his wife met with Dr. Goldman on November 6, 2013. (Tr. 125-28). Plaintiff reported that he had been off his medication for at least one month because he had lost his Medicaid coverage. (Tr. 125). Based on the November 6, 2013 session, Dr. Goldman completed an updated MSS for Plaintiff. (Tr. 56-57). Dr. Goldman stated that, since completing the November 2012 MSS, Plaintiff's impairments had worsened so that he was: markedly impaired in his ability to understand and remember simple instructions; extremely impaired in all other areas of decision-making, understanding, remembering, and following instructions; and extremely impaired in all areas of social interaction. (Id.).

On February 13, 2014, a social worker at Mark Twain Behavioral Health completed a Psychosocial/Clinical Assessment based upon an interview with Plaintiff, discussion with Mr. Smith, and review of Plaintiff's treatment records. (Tr. 82-98). Plaintiff was taking hydrocodone, Adderall, and alprazolam, and he stated that "the symptoms he has are fairly well maintained presently by the medications he's on." (Tr. 85). The social worker rated Plaintiff's GAF at 43 and wrote: "His affect is bland. His mood is dysthymic. . . . His thoughts were clear and goal directed. He was oriented to person, place, time and situation. His memory both recent and remote was fair. His concentration was fair. He does have problems with decreased energy." (Id.). Additionally, Plaintiff reported that "at times he struggles with feelings of hopelessness and worthlessness because of his chronic physical health issues which prevent him from working," but he believed the medications "help[ed] him control his temper better." (Id.).

On February 24, 2014, Mr. Smith completed a treatment plan for Plaintiff, which Dr. Goldman signed. (Tr. 60-67). According to the treatment plan, Plaintiff's had: a GAF score of 43; extreme occupational problems; and moderate problems with social network, family, and daily living skills. (Tr. 61).

### III. *Standards for Determining Disability Under the Act*

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

### IV. *The ALJ's Determination*

As an initial matter, the ALJ determined Plaintiff's date last insured. (Tr. 13). The ALJ explained that, according to Plaintiff's earnings records, Plaintiff had "acquired sufficient quarters of coverage to remain insured through June 30, 2011," and Plaintiff therefore "must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits." (Id.). Additionally, because Plaintiff filed his application for Social Security disability insurance benefits on May 29, 2012, he had to prove that he was disabled within the preceding one-year period, or the time period beginning May 29, 2011. (Id.). The ALJ therefore determined that, to demonstrate he was entitled to Social Security benefits, Plaintiff must prove that he was "under a disability within the meaning of the Social Security Act from May 29, 2011, one year back in time from the May 29, 2012 protective filing date, through the June 30, 2011 date last insured." (Id.).

The ALJ proceeded to apply the five-step evaluation process set forth in 20 C.F.R. § 404.1520 and found that Plaintiff: (1) did not engage in substantial gainful activity prior to June 30, 2011, the date last insured[4]; (2) had the severe impairments of disorder of the back, left shoulder degenerative joint disease, right upper extremity neuropathy, attention deficit hyperactivity disorder, depression, and anxiety; (3) had the non-severe impairments of substance abuse, absent right kidney, and kidney stones; and (4) did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 15-16).

In regard to Plaintiff's mental impairments, the ALJ noted that Plaintiff failed to file the function report required by the SSA. (Tr. 18). Nevertheless, the ALJ found that Plaintiff had

---

[4] The ALJ noted that the record contained evidence that Plaintiff was working "off the books" in 2011 and 2012. (Tr. 15). However, the ALJ declined to determine whether that work constituted substantial gainful employment because "there exists a valid basis for denying the claimant's application[.]" (Id.).

mild restrictions in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Id.). The ALJ found that, through Plaintiff's date last insured, he retained the residual functional capacity (RFC) to perform a range of sedentary work with the following limitations:

> a sit/stand option allowing the claimant to sit or stand alternatively at will providing that he is not off task more than 10% of the work period. The claimant cannot climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs. He can occasionally stoop, crouch, kneel and crawl. He can occasionally reach overhead with the left upper extremity. He can occasionally handle objects (gross manipulation) and finger objects (fine manipulation of items no smaller than the size of a paper clip) with his right upper extremity. He must avoid all use of hazardous machinery meaning unshielded moving machinery. He must avoid all exposure to unprotected heights. The claimant is limited to simple, routine and repetitive tasks, as defined in the Dictionary of Occupational Titles as SVP levels 1 and 2, without strict production quotas (i.e., with an emphasis on a per shift rather than a per hour basis). He is limited to occasional interaction with the general public. He can work around co-workers throughout the day, but with only occasional interaction with those co-workers.

(Id.).

The ALJ recounted Plaintiff's testimony that he was thirty-one years old and "had been unable to perform work activity since July 1, 2007 due to back pain radiating to his lower extremities along with neck, left shoulder and right wrist pain." (Tr. 19). Plaintiff also testified that he was unable to lift more than ten pounds with both hands, walk more than half a block, sit more than five minutes, or stand more than ten minutes. (Tr. 19-20). Although the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," he concluded that Plaintiff's statements regarding "the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" (Tr. 20).

In regard to Plaintiff's credibility, the ALJ found Plaintiff's testimony "inconsistent and exaggerated" and stated that his "characterization of pain was not consistent with the medical records and tests[.]" (Tr. 20). For example, although his earnings records reflected no earnings

in 2011 and 2012, Plaintiff made several comments to Dr. Memken during this time period about work he was performing. (Tr. 20). In addition, although the alleged onset date of disability was July 1, 2007, Plaintiff obtained certification as a heavy equipment operator in May 2009 and, in October 2009, he was standing up in the back of a four-wheeler when it was involved in an accident. (Id.). The ALJ also found that Plaintiff was noncompliant with treatment recommendations and that evidence in the record suggested he abused marijuana and pain medications. (Tr. 20-21).

The ALJ thoroughly reviewed all of Plaintiff's medical records through the date of the November 13, 2013 hearing. (Tr. 20-26). In regard to Plaintiff's physical impairments, the ALJ concluded "there is little objective evidence of record" to support his allegations of debilitating pain in his back, neck, or left shoulder prior to June 30, 2011, the date last insured. (Tr. 21). As to Plaintiff's mental impairments, the only evidence of mental health problems prior to June 30, 2011 were: (1) Plaintiff's report "that he had only brief out-patient mental health treatment in 2008, when he saw a couple of medical providers only a few times"; and (2) Dr. Memken's record that he briefly treated Plaintiff's mental problems in 2008 with "medication management." (Tr. 25).

The ALJ considered the medical opinion evidence and assigned "significant weight" to the opinion of Dr. Choma, Plaintiff's treating physician and a specialist in orthopedic surgery. (Tr. 25). The ALJ credited Dr. Choma's opinion that Plaintiff "could do work in the light exertional range with some additional limitations" because it was "consistent with the evidence for the time period at issue, between May 29, 2011 and June 30, 2011." (Id.). Based on Plaintiff's testimony at the hearing, however, the ALJ restricted Plaintiff "to less than the full

range of sedentary work." (Tr. 26). The ALJ noted that the record did not contain an assessment by a state agency medical consultant regarding Plaintiff's physical limitations. (Tr. 26).

The ALJ proceeded to consider and reject Dr. Goldman's medical opinions. (Tr. 26). The ALJ explained that the evidence did not support Dr. Goldman's finding that Plaintiff was disabled by mental impairments beginning in July 2007, and that Dr. Goldman's assessment of the severity of Plaintiff's impairments was inconsistent with his progress notes, "which show the claimant reported doing better when he was compliant with his medication." (Id.).

At step four of the five-step evaluation process, the ALJ determined that Plaintiff was unable to perform any past relevant work. (Tr. 27). At the final step, the ALJ noted that Plaintiff did not have the capacity to perform the full range of sedentary work, but found that jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC and that Plaintiff "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (Tr. 28). The ALJ concluded that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time through June 30, 2011, the date last insured." (Id.).

## V.    *Standard for Judicial Review*

The court must affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quotation omitted). In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, the court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's

determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

## VI.    *Discussion*

Plaintiff claims the ALJ erred in: (1) failing to assign controlling weight to the opinions of treating psychiatrist, Dr. Goldman; and (2) creating an RFC that was not supported by substantial evidence. (ECF No. 17). The Commissioner counters that the ALJ properly: (1) rejected Dr. Goldman's highly restrictive opinions because they were inconsistent with his treatment notes and the record as a whole; and (2) formulated the RFC based on Plaintiff's credibility and credible limitations. (ECF No. 26).

### A.  *Medical opinion evidence*

Plaintiff argues that, because Dr. Goldman was his treating psychiatrist, his medical opinions are entitled to controlling weight. In response, the Commissioner asserts that the ALJ properly determined that Dr. Goldman's medical opinions were inconsistent with his treatment notes and the record as a whole.

"A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008) (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Id. (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)). See also Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. § 404.1527(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

Dr. Goldman first evaluated Plaintiff in June 2012, approximately one year after Plaintiff's date last insured.[5] (Tr. 409-11, 431-35). In regard to Plaintiff's psychiatric history, Dr. Goldman noted only that Plaintiff had "a brief out-patient treatment episode at Mark Twain Behavioral Health in 2008 where he saw medical provider a few times." (Tr. 431). Dr.

---

[5] "When an individual is no longer insured for Title II disability purposes, [the Court] will only consider [his] medical condition as of the date [he] was last insured." Davidson v. Astrue, 501 F.3d 987, 989 (8th Cir. 2007) (quoting Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997)).. However, "[e]vidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded.'" Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (quoting Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998)).

Goldman observed that Plaintiff was "polite and cooperative," "conversant," had normal judgment and insight, and "maintained good eye contact," but displayed a "minor processing delay" and "jerky movements." (Tr. 409-10). Dr. Goldman assessed Plaintiff a GAF score of 45 and prescribed Saphris to stabilize and improve Plaintiff's mood. (Tr. 411).

When Plaintiff returned to Dr. Goldman on June 28, 2012, he reported that he was "doing better." (Tr. 408). At Plaintiff's appointments with Dr. Goldman on July 25, 2012, September 5, 2012, and October 29, 2012, Dr. Goldman wrote that Plaintiff had a "partial response" to medications and exhibited normal behavior, speech, affect, thought process, insight, judgment, and cognition. (Tr. 407, 406, 505).

In contrast to Dr. Goldman's treatment notes, which demonstrated that Plaintiff's behavior, demeanor, and cognition were normal, the MSS that Dr. Goldman completed on November 30, 2012 stated that Plaintiff was markedly or extremely impaired in nearly every functional category. (Tr. 53-55). Specifically, Dr. Goldman found that Plaintiff was moderately limited in his ability to understand and remember simple instructions and markedly or extremely impaired in his abilities to understand and carry out complex instructions and make judgments on simple work-related decisions. (Tr. 53). Additionally, Dr. Goldman wrote for the first time that Plaintiff's disability began as early as July 2007. (Tr. 54).

In his next appointment with Dr. Goldman on December 27, 2012, Plaintiff reported that he was "doing real good" and the Adderall, which Dr. Goldman prescribed in October 2012, was "helping a lot." (Tr. 503). Dr. Goldman noted Plaintiff had a "good response" to the medication. (Id.). On February 13, 2013, Dr. Goldman again stated that Plaintiff had a "good response" to medication and recorded Plaintiff's statements that, despite some depression after the death of

his mother's boyfriend, "I think I'm doing fine now" and "everything's been going very well." (Tr. 502).

Plaintiff did not see Dr. Goldman again until November 6, 2013, at which time Dr. Goldman completed a psychiatric progress note and an updated MSS.[6] (Tr. 125-28, 56-57). At that point, Plaintiff had "lost his Medicaid" and therefore "has not had his medication for at least one month." (Tr. 128). Dr. Goldman noted that Plaintiff was "fidgety, nervous, anxious," but his orientation, speech, thought process, judgment, insight, and cognition were normal. (Tr. 126). In the updated MSS, Dr. Goldman stated that the impairments to Plaintiff's abilities to understand, remember, and carry out instructions and make work-related decisions had declined since completion of the November 2012 MSS. (Tr. 56). Additionally, Dr. Goldman found that Plaintiff was extremely impaired in all areas of social functioning. (Tr. 57).

The ALJ thoroughly reviewed Dr. Goldman's treatment notes, evaluations, and medical source statements and explained his reasons for rejecting Dr. Goldman's medical opinions. The ALJ wrote:

> In June 2012, Dr. Goldman assessed the claimant's GAF score as 45 currently and 50 at the highest in the past year, indicating serious symptoms and limitations. Dr. Goldman also believed that the claimant had been disabled by his mental impairments beginning July 1, 2007, despite the fact that the claimant had last seen a mental health provider in 2008 and then had only seen medical providers a few times before initiating treatment with him in June 2012. On December 10, 2012, Dr. Goldman was of the opinion that the claimant's mental impairments caused mostly marked to extreme limitations in all of the mental domains. On November 6, 2013, he was of the opinion that since his last evaluation, the claimant's impairments had worsened and were now causing mostly extreme limitations.

(Tr. 26) (internal citations). The ALJ found that Dr. Goldman's opinions were inconsistent with his progress notes, "which show that the claimant reported doing better when he was compliant

---

[6] The record before the ALJ did not contain Dr. Goldman's treatments notes from the November 6, 2013 appointment.

with his medication." (Tr. 26). The ALJ further noted that there "was no medical evidence of record that Dr. Goldman had even seen claimant in the 9 months before the November 2013 evaluation and at his last visit of record in February 2013, the claimant reported that everything had been going very well as long as he was compliant with his medication." (Id.).

Plaintiff claims that the ALJ's reasons for rejecting Dr. Goldman's medical opinions are not supported by substantial evidence because, contrary to the ALJ's finding, Dr. Goldman met with Plaintiff prior to the November 2013 MSS. Because the Appeals Council considered Dr. Goldman's notes from the November 6, 2013 appointment when it denied review of the ALJ's decisions, those records are part of the administrative record on appeal. Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007). "Where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." Id.

While it appears that Dr. Goldman met with Plaintiff prior to updating the MSS in November 2013, the fact remains that there existed a nine-month gap between the February 2013 session and November 6, 2013 session.[7] Furthermore, lack of contact with Plaintiff was not the ALJ's sole reason for discrediting Dr. Goldman's medical opinion. As previously discussed, Dr. Goldman stated in the two MSS's that Plaintiff's impairments were considerably more severe than he suggested in his treatment notes. Additionally, Dr. Goldman completed the November 2013 MSS over two years after Plaintiff's date last insured and at a time when Plaintiff had been off his medications for approximately one month. (Tr. 125-28). At his previous appointment with Plaintiff in February 2013, Dr. Goldman found that Plaintiff was responding well to his medication. (Tr. 502).

---

[7] Although Plaintiff argues that Dr. Goldman signed a treatment plan for Plaintiff on May 13, 2013, review of the record reveals that Dr. Goldman signed the treatment plan on February 26, 2014. (Tr. 67).

Plaintiff also argues that the additional evidence he provided the Appeals Council regarding his treatment by Mark Twain Behavior Health and his CSS undermine the ALJ's decision to reject Dr. Goldman's medical opinions. "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). In this case, records relating to Plaintiff's mental health treatment from June 2012 through February 2014, is not material to determining whether Plaintiff was disabled by his mental impairments prior to June 30, 2011, the date last insured.

Upon review of the record, the Court concludes the ALJ properly evaluated Dr. Goldman's medical opinions and provided "good reasons" for his decision to reject them. The Court therefore finds that substantial evidence on the record as a whole supports the ALJ's treatment of medical opinion evidence.

*B. RFC*

Plaintiff claims that the ALJ's RFC assessment was not supported by substantial evidence because it did not adequately address either his mental health limitations or his physical pain. (ECF No. 17 at 22). The Commissioner counters that Plaintiff presented little evidence of mental impairments existing prior to the date last insured. (ECF No. 26 at 10). In regard to limitations imposed by Plaintiff's pain, the Commissioner asserts that the objective medical evidence relating to the insured period did not support a more restrictive RFC. (Id.).

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a)(1). See also Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's

own description of his limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation omitted). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v Astrue, 495 F.3d 614, 619 (8th Cir. 2007)). "However, there is no requirement that an RFC finding be supported by a specific medical opinion." Id. Nor is an ALJ limited to considering medical evidence exclusively when evaluating a claimant's RFC. Cox, 495 F.3d at 619. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

In formulating Plaintiff's RFC, the ALJ included nonexertional limitations with Plaintiff's "pain and his mental impairments in mind." (Tr. 27). The ALJ found that, from May 29, 2010 through June 30, 2011, Plaintiff was unable to perform a full range of sedentary work because he "was impeded by additional limitations." (Tr. 28). Specifically, the ALJ wrote:

> [T]he claimant is limited to simple, routine and repetitive tasks, as defined in the Dictionary of Occupational Titles as SVP levels 1 and 2, without strict production quotas (i.e. with an emphasis on a per shift rather than a per hour basis). He is limited to occasional interaction with the general public. He can work around co-workers throughout the day, but with only occasional interaction with those co-workers.

(Tr. 27).

Plaintiff argues that the RFC "does not align with Dr. Goldman's restrictions" or the counseling records of Mr. Smith, which regularly indicated that Plaintiff "had to work…on anger management and controlling his irritability." (ECF No. 17 at 22). As previously stated, substantial evidence supported the ALJ's rejection of Dr. Goldman's restrictions. In regard to Mr. Smith's counseling records, the Court finds they support the ALJ's finding that Plaintiff was not disabled prior to June 30, 2011 because he was able to perform at least some work beyond

that date. (Tr. 429, 427). For example, Plaintiff informed Mr. Smith in July and August 2012, that he was able to do "small jobs and look at expanding some business options" and assist his brother-in-law "in various activities." (Tr. 429, 427). Mr. Smith's records also reveal that Plaintiff's mood improved when he was medication compliant. The Court therefore concludes that consideration of Mr. Smith's records would not change the RFC and the ALJ adequately accounted for Plaintiff's mental impairments by restricting the work to simple, routine, and repetitive tasks and limiting Plaintiff's interaction with coworkers and the general public.

Finally, Plaintiff argues that the RFC is not supported by substantial evidence because it did not account for his chronic pain, which would render him unable to work on a consistent basis. However, evidence of Plaintiff's medical condition prior to the date last insured does not dictate an RFC more restrictive than that formulated by the ALJ.

The record reveals that Plaintiff sought treatment for his degenerative disc disease from Dr. Memken in September 2008 and October 2009. (Tr. 382, 385). On January 25, 2010, Plaintiff presented to the emergency room for pain in his head and neck, and he followed up with Dr. Memken on January 29, 2010. (Tr. 355, 387). Dr. Memken referred Plaintiff to Dr. Glanton for pain management, but Dr. Glanton refused to prescribe him pain medication. (Tr. 387-87). On March 10, 2010, Plaintiff called Dr. Memken and requested a refill on his hydrocodone. (Tr. 388). On November 3, 2010, Plaintiff returned to Dr. Memken's office with a dislocated left shoulder. (Tr. 389).

The ALJ considered the evidence of Plaintiff's back, neck, and shoulder pain through the date last insured and factored it into the RFC. The ALJ found that that Plaintiff could perform a range of sedentary, unskilled work with limitations, including "a sit/stand option allowing the claimant to sit or stand alternatively at will providing that he is not off task more than 10% of the

work period." (Tr. 18). The ALJ also further limited Plaintiff to occasional: overhead reaching with the left extremity; climbing of ramps and stairs; stooping, crouching, kneeling, or crawling; and handling or fingering objects with his right upper extremity. (Id.).

Furthermore, the substantial medical evidence in the record supported the ALJ's RFC. Plaintiff's treating physician, Dr. Choma, completed a MSS on January 14, 2014. (Tr. 470-73). In the MSS, Dr. Choma found that Plaintiff had moderate exertional limitations, such as an ability to stand, walk, or sit about six hours in an eight-hour workday. (Tr. 470-71). Dr. Choma also found that Plaintiff could occasionally climb, balance, kneel, crouch, crawl, and stoop, and that Plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 472-73). The ALJ assigned Dr. Choma's MSS "substantial weight," but nevertheless included an RFC with greater restrictions than those recommended by Dr. Choma. (Tr. 25).

Based on the foregoing, the Court concludes that the record contained substantial evidence to support the ALJ's RFC assessment, which properly accounted for Plaintiff's mental impairments and pain. Although Plaintiff cites evidence that might support a contrary decision, substantial evidence supports the ALJ"s RFC determination and, as such, this Court is required to affirm.

## VII. *Conclusion*

For the reasons discussed above, the undersigned finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED.**

A separate judgment in accordance with this Memorandum and Order is entered this date.

_Patricia L. Cohen_
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of November, 2016